JARDEN *against* The PHILADELPHIA, WILMINGTON
AND BALTIMORE RAIL ROAD COMPANY.

### IN EQUITY.

By an act of assembly, passed in 1831, a company was incorporated, for
the purpose of making a railroad from Philadelphia to the line of the
state of Delaware, with authority to locate the road along the route of
the Baltimore post road, or as near thereto as the ground would admit.
The act also contained a provision for the assessment and payment of
damages to the owners of land taken for the purposes of the road.   In
1838 an act was passed, which provided, "that Prime street, from Broad
street to Gray's ferry road, in the county of Philadelphia, be, and the
same is hereby laid out of the width and in the same direction that it is
now opened from Eleventh street to Broad street; and it shall be the
duty of the commissioners of the said county forthwith to open or cause
to be opened the street aforesaid ; the damage accruing therefrom to be
assessed and paid in the usual manner, except that one-third of the
expenses arising from the increased width of said Prime street shall be
paid by" the above-mentioned company; "and the said company are
hereby authorized to lay a double tract of rails in the centre of the said
street immediately after the passage of this act, and in no other street
running parallel therewith ; and the said company are hereby required
to grade the said Prime street from Broad street to Gray's ferry road for
ordinary travelling and use."   *Held*, that it was not lawful for the said
company, under these acts, to enter upon private land, for the purpose
of locating and laying their railroad, until Prime street should first have
been opened by the county commissioners ; and that it was a proper case
for an injunction.

THIS case came before the Court on a motion to dissolve an
injunction which had been granted on the filing of a bill by
William Jarden, against the Philadelphia, Wilmington and Balti-
more Railroad Company.

The bill set forth, " That Jacob Lesher, the elder, on the ninth
day of June, A. D. 1835, died, seized in his demesne as of fee, of
a certain tract or piece of land situate in the township of Passyunk
and county of Philadelphia, beginning at a post standing in a
lane called Sober's Lane, adjoining land of Israel Pemberton, and
runs thence N. 63° 45' W. ninety-four perches to a post standing
in the land of said Pemberton, and other land of John Sober;
thence S. 41° 30' W. seventeen perches to another post standing
in the land of said Sober; thence along the said land S. 62° E.
ninety-three perches to a post in the said lane; thence along the
front of the said lane or road (thrown out by the said John Sober,
to be a common lane or road of thirty-five feet wide,) N. 42° E.
twenty perches to *the place of beginning; containing ten    [*503]
acres and a half; and on the death of the said Jacob Lesher,

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

the elder, the said tract or piece of land descended to his children and heirs at law, William Lesher, Samuel Lesher, David Lesher, Margaret Lesher, George Lesher, John Lesher, Maria Allwine, Elizabeth Charley, and Jacob Lesher, who, being seized thereof in fee, by indenture, dated the 31st day of May, A.D. 1836, (recorded in the office for recording deeds in the city and county of Philadelphia, in deed book S. H. F. No. 2, p. 622, &c.) granted and conveyed the same to the complainant, who hath ever since been and now is seized in his demesne as of fee of the said tract or piece of land.   That on the 27th day of February, A.D. 1838, an act of assembly was passed, entitled "An act to authorize the governor to incorporate a company to erect a bridge over the Conemaugh river, at or near Centreville, in the county of Indiana, and for other purposes," the fourteenth section of which is in the following words, to wit: "Section 14.   And be it further enacted by the authority aforesaid, that Prime street, from Broad street to Gray's ferry road, in the county of Philadelphia, be, and the same is hereby laid out of the width and in the same direction that it is now opened from Eleventh street to Broad street; and it shall be the duty of the commissioners of the said county forthwith to open or cause to be opened the street aforesaid, the damages accruing therefrom to be assessed and paid in the usual manner, except that one-third of the expense arising from the increased width of said Prime street shall be paid by the Philadelphia, Wilmington and Baltimore Rail Road Company; and that the said company are hereby authorised to lay a double track of rails on the centre of the said street, immediately after the passage of this act, and no other street running parallel therewith; and the company aforesaid are hereby required to grade the said Prime street from Broad street to Gray's ferry road, for ordinary travelling and use."   The bill then stated that the tract or piece of land thereinbefore described and belonging to the complainant, lies between said Broad street and Gray's ferry road, and will be intersected by said Prime street, when the same shall be opened in the manner prescribed by the act of assembly above recited.   But the complainant averred, that said Prime street has never yet been opened at all westward of said Broad street, nor between said Broad street and Gray's ferry road; and that no damages have ever been assessed or paid to the owners of land, or any of them, between said Broad street and Gray's ferry road, for the injury which they will sustain by the opening of the said Prime street.

The bill then charged, that the Philadelphia, Wilmington and Baltimore Rail Road Co. by its engineer, officers, agents and workmen, had entered upon the complainant's tract of land, and were proceeding to lay out, grade and construct a rail-road,

(Jarden v. The Philadelphia, Wilmington and Baltimore Rail Road Co.)

through and across the same tract of land, and were then actually laying out, grading and *constructing such rail-road. [*504] All which proceedings and acts of the said company and its engineer, officers, agents and workmen, were contrary to law, and prejudicial to the rights of the complainant, &c.

The bill then prayed a subpœna, and an injunction to restrain the said company, its officers, engineers, &c., from entering upon the complainant's land, and constructing a rail-road through or across the same.

The affidavit of the complainant, which was attached to the bill, stated that on the Friday preceding he found that stakes had been driven across his land in the direction of Prime street, and during his absence. That the complainant, on the same day, called at the office of the company, and was informed, that this was done by the orders of the company, and that they were going to lay out and construct their rail-road across his land.

In a supplemental affidavit, which was filed by agreement, the plaintiff stated, that he purchased the premises in the year 1836, for the price of $18,180 : that he was a brickmaker; and his primary object in purchasing the premises was to rent them as a clay lot for the purpose of making bricks : that about one-third of the lot has clay in it suitable for making bricks; that the line of the rail-road runs directly through the clay part of the lot—actually occupies a great portion of it, and cuts him off from the use of the rest; so that it will be entirely impossible to use the lot as a brick yard at all; and that the clay part of the lot would now command a rent of $700 per annum for ten years as a brick yard; but if the rail-road be run there, it will not command $100 rent.

The material parts of the answer were as follows :

The defendants admitted it to be true, that "on the 27th day of February, 1838, an act of assembly was passed with the title and of the character set forth in the said bill, the fourteenth section whereof is in the words set forth in the said bill of complaint. And the defendants farther say, that an act of assembly of the commonwealth of Pennsylvania was passed on the second day of April, one thousand eight hundred and thirty-one—a true copy of which is hereto annexed; and the defendants pray that it may be received as part of this their answer. These defendants admit, that the said Philadelphia, Wilmington and Baltimore Rail Road Company, by its engineer, officers, agents and workmen, are proceeding to lay out, grade and construct a double track of rails, on the centre of Prime street, from Broad street to Gray's ferry road in the county of Philadelphia, as well they may by the provisions of the several acts of assembly above re-

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

ferred to; and the said company are, and at all times have been [*505] and will be ready and willing to pay such *compensation for any gravel, stone, wood, and other materials, which may be taken for the purpose of constructing and maintaining such rail-road, and for any land that may be or may have been entered upon, taken possession of, or used for the same, as may be agreed upon between the said company and the owners thereof respectively, or which may justly and legally be payable for the same, and for all damages sustained or to be sustained by reason thereof; and the defendants submit that it is altogether immaterial whether the said Prime street has ever been opened at all westward of Broad street, or between Broad street and the Gray's ferry road, but they believe and admit, that no such opening has taken place; and that no damages have been actually assessed or paid to the owners of land between Broad street and Gray's ferry road for the injury which they will sustain (if any injury will thereby be sustained,) by the opening of Prime street; but they submit, that it is altogether immaterial whether any damages have been so ascertained, assessed or paid; inasmuch as the said company are liable to such assessment and payment, and competent to meet and discharge the same. The said company, by its engineers, officers, agents and workmen, and the said defendants, in the capacities set forth in the said bill, have entered upon different pieces of land in the situation described in the bill as belonging to the complainant, and are proceeding to lay out, grade and construct a rail-road through and across the same, and are now actually laying out, grading and constructing such rail-road; but whether the said land be the land of the complainant, or of any other person, these defendants do not know, and pray, that if material, the complainant be put to the proof that such is the case; and also, that the complainant's tract of land lies between Broad street and the Gray's ferry road, of which these defendants have no knowledge; and therefore to any interrogatory in relation thereto they are not able to make answer."

The act of April 2nd, 1831, referred to in the answer, was entitled "An act authorising the governor to incorporate the Philadelphia and Delaware County and Southwark Rail Road Companies." The tenth section of this act authorised the company "to locate and construct a rail-road of one or more tracks, from a point at or near the city of Philadelphia; thence along the route of the Baltimore post-road, or as near thereto as the ground will admit; making the post towns of Darby and Chester, or their vicinity, points in the said road to the Delaware State line; and to make, construct, and erect such ware-houses, toll-houses, carriages, cars, and all other works and appendages

(Jarden v. The Philadelphia, Wilmington and Baltimore Rail Road Co.)

necessary for the convenience of the said company, in the use of the said rail-road : provided, that where the track of the post-road shall be used for the said rail-road, the latter shall not be so located as to interfere with the post-road." The twenty-*second section authorised the Southwark Rail Road Company to construct a rail-road " from Broad street, in [*506] the county of Philadelphia, to the river Schuylkill."

On the filing of the answer, Mr. *J. R. Ingersoll*, for the defendants, moved to dissolve the injunction which had been granted upon motion, at the filing of the bill. He argued,

1. That this was a public highway, and for the public benefit. The public have a right of passage over the road by paying a reasonable, stipulated, uniform, toll. The execution of it does not make its use private. If the public can pass and repass and enjoy its benefits by right, it matters not whether the toll is due to a public or a private corporation. The true criterion is whether the objects, uses and purposes of the corporation are for public convenience or private emolument, and whether the public can participate in them by right, or only by permission. *Bonaparte* v. *The Camden and Amboy Rail Road, Co.*, (1 Baldwin, 223).

2. The location of the rail-road is fixed by law, and it is precise and definite. One of the questions which arose in the case of the Camden and Amboy rail-road was whether, prior to location, the company had a right to take the ground of the complainant. It was admitted, that the final location of the road was not determined upon, and that the survey was not deposited. They could not, therefore, enter for the purpose of making the road, though they might for the purpose of location.

3. The location is in a public street or road actually laid out, and that by the conclusive authority of an act of assembly, which makes it the duty of the county commissioners forthwith to open the street or road, and whether opened or not, anthorises the company to lay a double track of rails in the centre of the street, immediately after the passage of the act. The laying of the rail-road has nothing to do with the opening of the street. It is to take place immediately after the passage of the law. Nothing can be supposed as matter of impediment, unless the allegation in the bill, that " no damages have ever been assessed or paid to the owners of land between Broad street and Gray's ferry's road, for the injury they will sustain by the opening of Prime street." Now no damages can be assessed or paid until the ground is used, or the street is opened. The law provides, that the damages are to be assessed and paid in the usual manner, except that one-third of the expense arising from the

(*Jarden v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

increased width of Prime street is to be paid by the company. Then what is the usual manner ? This is clearly shown by the 7th section of the act of 13th of June, 1836, to be one year after the opening of the road. It is true, that Chancellor Kent, in the case of *Gardner* v. *The Village of Newburgh,* (2 Johns. Ch. Rep. 166,) says that compensation must be previously made, but the cases quoted do not bear out the position. *Kings Lynn* v.. *Pemberton,* (1 Swanst. 250). This is not a case for an injunction, before hearing, at least. The road is \*lawful. The company is able and willing to pay every thing that they may be required to pay, and if they should prove hereafter to be unable, the whole county is liable. *Attorney General* v. *Nichols,* (16 Ves. 341).

Mr. *Meredith, contra.*—This case is of the first impression in this Court. I do not mean to question the right of the legislature to authorise a private company to take private property, provided they conform to the bill of rights.

1. This is a proper case for an injunction. The legislature has given the power to this Court by general and express terms in the act of 1836. The jurisdiction has frequently been exercised in cases like the present, both in this country and in England. *Bonaparte* v. *Camden and Amboy Rail Road Co.* (1 Baldwin, 205) ; *Gardner* v. *Newburgh,* (2 Johns. Ch. Rep. 166) ; *Belknap* v. *Belknap,* (2 Johns. Ch. Rep. 463–473) ; *Hughes* v. *Morden College,* (1 Ves. Sen. 188) ; *Hand* v. *Aberdeen Canal,* (2 Dow's P. C. 519) ; *Agar* v. *Regent's Canal,* (Cooper's Eq. Cases, 77). These cases prove that public works through the land of an individual may be restrained by injunction. In the case of a private right it is more easy to obtain redress at law. In the case of ancient lights, redress has been given in the same way. The injury may be irreparable, if not prevented.

2. The acts of assembly are not to be so strained as to deny compensation. The answer of the company is ambiguous and evasive. They have put the party in such a situation as to disable him from obtaining compensation. The two acts are entirely inconsistent. It is impossible that the defendants can rely on the original act of incorporation, which forbade the making of a bridge. Act of 1831, § 22. They have made no effort to come to an agreement with the owner of the land, as required by the twelfth section. In their answer, they aver that they do not know who the owner is. Nothing but the clearest declarations on the part of the legislature will induce the Court to suppose that they meant to take private property without allowing compensation. In *Bonham's Case,* (8 Rep. 118,) it is said, that a statute shall receive such a construction, that no

(Jarden v. The Philadelphia, Wilmington and Baltimore Rail Road Co.)

innocent person shall receive any mischief by it. The bill of rights was merely declaratory of the general principles of government. Two material facts have been stated and admitted. 1st. That Prime street has never been opened west of Broad street; and 2nd. That no damages have been assessed for the opening of it. By the true construction of the act, the opening of the street must precede the laying of the rails. It is conceded, that the damages are to be paid by the county, and not by the company. This is a very serious injury to the complainant. The lot contains clay, intended to be made into bricks. The "usual manner," with respect to streets, is to pay before opening them. What is meant by the *expense* of widening Prime street? It does not mean the damages *which are to be [*508] assessed for opening the street. The general road law is clearly referred to. In *The People* v. *Platt*, (17 Johns. Rep. 215,) Chief Justice Spencer says, "Private property may in many instances be appropriated to public use; but such appropriations are constitutional, legal and justifiable, only when a fair and just equivalent is awarded to the owner of property thus taken." In *Bradshaw* v. *Rogers*, (20 Johns. Rep. 105, 106,) it is said, that compensation for property taken is "a great and fundamental principle of government, and that any law violating that principle must be deemed a nullity, as it is against natural right and justice." *Bank of Hamilton* v. *Dudley*, (2 Peters, 506); *Rex* v. *Manning*, (1 Burr. 267); *Leader* v. *Moxton*, (3 Wils. 461); *Sir John Popham's Case*, (10 Rep. 141); *Vanhorne* v. *Dorrance*, (2 Dall. 312); *Pickering* v. *Rutty*, (1 Serg. & Rawle, 504); *Enslin* v. *Bowman*, (6 Binn. 471); *Kensington Case*, (2 Rawle, 448); *Commonwealth* v. *M'Allister*, (2 Watts, 193); *Commonwelath* v. *Fisher*, (1 Penn. Rep. 464).

*Reply.*—This is the case of a road laid out under the general road law. The clause respecting the laying of rails, is separate and distinct. It is not necessary that a street should be virtually opened. It is sufficient if it be laid out. In the case of the *Camden and Amboy Rail Road*, Judge Baldwin held, that it was not necessary that the act should contain a provision for compensation. The case of *Vanhorne* v. *Dorrance*, has been said by this Court not to be law. The other cases cited merely recognise the undoubted principle, than compensation must be made at some time. The question is *when*. If you say it must be made before the street or road is laid out, you must strike out the general road law, and a great many other statutes. In *M'Masters* v. *The Commonwealth*, (3 Watts, 292,) it was held that a law was constitutional, although it did not provide for compensation *a priori*. In the act of 1831, compensation is

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

abundantly secured. The company, in their answer, declare their willingness and ability to pay; and this is sufficient, according to the cases referred to. The act of 1838, also provides sufficiently for compensation. The provision respecting streets, gives power to the Quarter Sessions, to appoint a jury to assess damages; and if the county commissioners should refuse payment, which is not to be anticipated, this Court may compel them by mandamus.

The opinion of the Court was delivered by

SERGEANT, J.—The mode of assessing the damages sustained by an individual, whose land is taken for the purpose of opening a public road which passes through it, is now prescribed by the 6th, 7th, and 8th, sections of the act of the 13th June, 1836, relating to roads, highways, and bridges. After the road has been [*509] laid out by *viewers, and approved by the Court, and entered of record, it is to be opened as soon as practicable; and the owner of the land through which the road is opened, may, within one year from the opening of the same, apply by petition to the Court of Quarter Sessions of the proper county, setting forth the injury which he or they may have sustained thereby, and thereupon the Court is to appoint six persons to view the premises and assess the damages, &c. If their report be approved by the Court, the amount of damages awarded is to be paid by the treasurer out of the county stock, to the party entitled thereto. By the latter sections of this act, the viewers in the county of Philadelphia, are appointed in a different manner from those in other counties, but the same proceedings are to be had as to views and assessments of damages. There are local laws, applying to the city of Philadelphia, the township of the Northern Liberties, and the district of Southwark, which provide regulations on the subject somewhat different from the above, but it seems that the township of Passyunk, in which the route of this railroad is contemplated, is governed by the law which applies to the county generally.

It is, therefore, to these proceedings the legislature must refer in the act of the 27th of February, 1838, sec. 14, stated in the bill and answer, by which they enact, that "Prime street, from Broad street to Gray's ferry road in the county of Philadelphia, be, and hereby is, laid out of the width and in the same direction, that it is now opened from Eleventh street to Broad street, and that it shall be the duty of the commissioners of the said county forthwith to open, or cause to be opened the street aforesaid, *the damages accuruing therefrom to be assessed and paid in the usual manner*, except that one-third of the expense arising from the increased width of the said Prime street, shall be paid by the

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

Philadelphia, Wilmington and Baltimore Railroad Company." The effect of this act of assembly is, that the street is *laid out* by the legislature instead of the Court. The county commissioners, however, are to *open* it, and the damages are to be assessed and paid in the same manner as if it had been laid out by the Court, under the act of 13th of June 1836, namely, on the petition of the owner of the land, presented to the Court of Quarter Sessions, *after the street has been opened,* and are to be paid by the treasurer out of the county stock. These are the only terms on which the damages can be assessed and paid. If the owner of the land should present his petition to the Court of Quarter Sessions, asking for viewers to assess the damages he may have sustained, he must set forth and show that the road has been opened; it is not sufficient to show that it has been laid out. In many instances streets have been laid out several years before they are opened, and in the meanwhile are inclosed and occupied by the owner without any visible difference from his other property; and the public is not bound to pay for them until they are actually opened for public use as a highway, and become *thus appropriated to them as their property, and the exclusive right and occupation of the former owner is [*510] taken away. And for this reason the period of limitation prescribed, the year to which the owner is restricted for filing his petition for the assessment of damages, commences not from the laying out but from the opening of the road.

Now, it is admitted in the answer, that Prime street has not been opened by the county commissioners under this act, and that no damages have been actually assessed or paid to the owners of land—nor indeed, could they be legally assessed or paid under the act of 1838, until such opening took place. But it is insisted that it is immaterial whether such opening has taken place or not. I cannot, however, think so. It certainly was not the intention of the legislature or the purport of this act to place any owner of the land through which this railroad was to run, in such a situation as that he should have no legal remedy for the recovering of his damages. On the contrary the right of the owner to damages is carefully preserved : nor do I know of any instance in which, for many years past, the legislature has authorized a company, incorporated for the purpose of making a turnpike, canal, or railroad, to take private property without making a provision for compensation for land taken for that purpose. And here if the provisions of the act are observed and carried into effect, the right of the owner is effectually guarded and rendered available by a course of proceeding of every day's practice in the Court of Quarter Sessions. But if so essential an item as the opening of the street is omitted, the right to

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

damages, which depends upon it, will be utterly defeated, and the owner may lose his land without having the damages contemplated by the act.

Besides this difficulty, there is another of great weight. The defendants have thought proper to obtain from the legislature an act authorizing them to take land for their railway, not in the ordinary mode of occupying it for their own purposes, and paying the damages themselves, but by a combined operation in conjunction with the county commissioners, in which two objects are to be attained; first, a street is to be opened by the county commissioners, of a greater width than the railway requires, which street is of course to be for the use of common wheel carriages, and to belong to the public, and to be under the superintendence of the supervisors of the township, in the same manner as other roads and highways are under the laws of the commonwealth, and is to be paid for when opened, out of the county stock; secondly, the company are to lay down their tracks of railway on the centre of that street, the company to pay one-third of the expenses arising from the increased width, and to grade the street for ordinary travelling and use. It appears to me to be the plain construction and intent of this act, that both these objects are to be effected; and that if the street is not opened by the authority [*511] alone empowered to open it, the railway *is not to be laid down there. Why the company have chosen thus to combine their action with the co-operation of the county commissioners, instead of acting for themselves as is usual, or whether the county commissioners have been applied to and declined to co-operate, or if they have, for what reasons they have thought it expedient to do so, is not stated in the answer. It is admitted that the street has never been opened by them; and that being the case, to use the language of Mr. Justice Baldwin, 1 Baldwin's Rep. 230, it is manifest "that the steps have not been taken which are made indispensable to the defendants' right to enter upon and take possession of the complainant's property; and they now stand before the Court as if their charter contained no provision for compensation, and can stand in no better, until the provisions (of the act of 1838,) are complied with. It would contradict the law, and every principle of justice, to permit the complainant to be disseised, not only without due process of law, but in violation of that which has been prescribed for the benefit of the corporation, and to be handed over to seek his compensation as he may." *Ib.* What has happened has been without the act or default of the complainant, and simply from the terms in which the law has been enacted, and the failure to carry out those terms in the manner expressly prescribed by the act of assembly.

The subsequent clause authorising the company to lay a double

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)
track of rails on the centre of the said street *immediately after the passage of this act,* and on no other street running parallel therewith, has been urged by the defendants as empowering them to lay down their track at once, without waiting for the opening of the street by the county commissioners. To give the act this construction would be inconsistent with the previous provisions of the law, and effect what it is manifest the legislature did not intend—the taking away the property of the complainant without any resort for compensation; for without such opening, as has already appeared, he could not apply to the Court of Quarter Sessions, and obtain an assessment. No rail-road law has ever gone so far as this, and it is probable never will. It certainly was·not designed by this act. The *street,* therefore, on which the company are to lay down their rails, is the street laid out by the act after it shall have been opened by the county commissioners, in the manner prescribed, and not before; and the authority to lay the rails immediately after the passage of the act, must be construed in connexion with the context, as an authority to do so, under, and subject to previous provisions and conditions, and as contemplating that the street would be duly opened forthwith and be ready for the laying of the rails.

The allegation of defendants,. of a right under the act of the 2d of April, 1831, incorporating the Philadelphia and Delaware county and Southwark Rail Road Companies, and of their being ready and willing to pay any damages, and being liable to assessment *therefor, seems to me to confer no right whatever upon them. The private property of one person can be [\*512] taken by another only by the authority of the legislature, and under the terms it prescribes. The act of the 2d of April, 1831, sec. 10, which has been referred to by the counsel for the defendants, authorises the Philadelphia and Delaware county Rail Road Company, to locate and construct a rail-road of one or more tracks, from a point at or near the city of Philadelphia, *thence, along the route of the Baltimore post road,* &c. But the rail-road now in question does not run along the route of the Baltimore post road : it runs in another direction from eastward to westward, and if continued would cross it. Besides, this provision is repealed by the third section of the supplement, annexed to the defendants' answer : and whatever route the company might have been at liberty to take prior to the act of assembly of 1838, yet since that act they cannot take the one it prescribes, except on the terms therein contained.

As to their being liable to assessment for the damages, I think it is clear, on the face of the act of 1838, that it is only the county stock which is liable to the owners of lands, and not the company, although the latter are subjected to an ultimate respon-

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

sibility for one-third of the expense arising from the increased width of the street, and to the duty of grading the street, for ordinary travelling and use. No proceeding could be had against *the company* under this law for the assessment of damages sustained by the owners of land; the only proceeding is in the usual manner for a recovery from the county stock, after the street shall have been opened. Nor can any offer by the defendants to pay those damages, or averment of their readiness and willingness to do so, authorise them to take the property of another without his consent, where no act of the legislature authorises them to do so. The private property of another can only be taken by the authority of the law, even though the party taking it is willing and offers to pay for it. If the company could in this way acquire the property, the object of the act of 1838 would be defeated; for if they pay for it in full, it ought to become their exclusive property, and the public would thus be forever deprived of the right to occupy and use it as a street; whereas, it was intended by the act, that it should be both a street and a railway, for the use as well of common wheel carriages, as for rail cars, and that the street should belong to the public, and be, like other streets and roads in the township, under the superintendence of the supervisors.

That this is not a proper case for an injunction, has not been much insisted upon, nor do I think it could be, after the case of *Bonaparte* v. *The Camden and Amboy Rail Road Company*, reported 1 Bald. Rep. 205, in which Mr. Justice Baldwin examines the subject with great learning and ability, cites the numerous cases that have been determined, and comes to the conclusion: [*513] that the *complainant may recover damages at law, is no answer to the application for an injunction against the permanent appropriation of his property for the road under a claim of right. This is deemed an irreparable injury for which the law can give no adequate remedy, or none equa to that which is given in equity, and is an acknowledged ground for its interference. Trespass is destruction in the eye of equity. It prevents its repetition or continuance, protects the right, arrests the injury, and prevents the wrong. This is a more beneficial and complete remedy than the law can give, and therefore the proper one for a Court of Equity to administer.

HUSTON, J., (after stating the substance of the bill and answer.)—The power to grant injunctions, is new in Pennsylvania; to the extent in which it has been used of late years, it is new in England; as late as 1786, Lord Thurlow, on an application for an injunction to stay a trespass in cutting timber, directed

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)
precedents to be searched for, and none being found, refused the injunction.

Of late years, they are usual to stay waste by tenants for life or for years, at the instance of the remainder-man or reversioner; in the first case, on account of the trusts, and in the latter, because it is alleged as destructive of the timber, or houses wasted, and often without any probability of redress.

We have at present to decide on a case somewhat different from these, and which did not probably arise in England until within a few years, and within the last twenty in this state, even if we had possessed the power of granting the injunction. I shall not attempt a review of all the cases having any similarity to the one before us.. Judge Baldwin has collected a great many of them, in 1 Baldwin, 218, and following pages. Most of these cases are to be found referred to, and in addition stated and commented on, in *Jerome* v. *Ross,* (7 Johns. Chancery, 330,) the last case in which Chancellor Kent gave an opinion. Similar cases had been frequently before him; and very shortly before, in 20th Johns. 737, the whole subject had been fully discussed. That case had originated before a justice of the peace, related to a quarter or a half an acre of land, had been decided by the Supreme Court without any argument by counsel, and was of this nature. The act for laying out the New York Canal had made provisions for ascertaining the value of the land taken, and for payment of the amount found by the appraisers, very much in the manner prescribed by all our acts on similar subjects. In the progress of the work, it was found the canal would in some places be constructed on land then public highways or turnpike roads, and a subsequent act authorised the canal commissioners, in such cases, to make a new road to supply the part occupied by the canal; and in this act there was no provision for compensation to the owner of the ground taken for such new road. On trespass *brought by the owner of whose [*514] land forty perches had been so taken to supply a part of a turnpike road, the justice gave judgment for the agents of the canal commissioners. The Supreme Court reversed this judgment. In delivering the opinion of the Court, Spencer, J., in speaking of the canal, and the act authorising the construction of it, says, (20 Johns. 104,) " For such objects it does not admit of a doubt, that the canal commissioners and their engineers and agents had a right to enter on and occupy land necessary to effectuate the objects of their appointment without having paid the loss and damage which the proprietor may sustain." Again, " the authority to enter is absolute, and does not depend on the appraisal and payment." But he considers the land taken in that case, as not for the use of the canal, but for the turnpike

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)
road; and he considers the turnpike a private road, and there
being no provision for payment of land taken for their use, the
opening the road in question was a trespass, in his opinion.   On
a writ of error Kent, C. delivered the unanimous opinion of that
Court.  And first, he decided, that although the turnpike was
made by a company, it was a public highway.  (This Court de-
cided the same point in *M'Clanahan* v. *Curwin,* (3 Yeates, 363,)
and often since.)   And second, that if the turnpike already made
was necessary for the canal, the part made new to supply what
had been taken, being necessary for the public, the land occupied
by it was lawfully entered on by the canal commissioners.   He
says, " the commissioners were made judges of what lands were
necessary for the prosecution of the improvements, and if they
even erred in judgment as to the extent, or the greater or less
degree of necessity, they would not be responsible as trespassers,
unless they acted in bad faith, or such egregious indiscretion as
to amount to it."   And again, " they must act with good faith,
and sound common sense, and then it was impossible for them to
be guilty of trespass."   Again, " every interpretation which
leads to an absurdity, or to embarrass or defeat the objects of
the statute, is to be avoided."   He then states, that all acts on
the same subject are to be considered, and if the part of the
turnpike was necessary for the canal, and the canal commis-
sioners were authorised to take it, and make a new piece of turn-
pike for the use of the public, all this will be compensated for,
under the first act; and if provision for compensation is made
by any act, it is sufficient: and adds, " I should doubt ex-
ceedingly, whether the general principle that private property
shall not be taken for public use, without compensation, is to be
carried so far, as to make a public officer, who enters on pri-
vate property, by virtue of legislative authority specially given,
for a public purpose, a trespasser, if he enter before the pro-
perty has been paid for."   And he adds: " The Supreme
Court admit this;" and the decision of the Supreme Court
was reversed.   But there is in one part of this opinion,
a *dictum* which would seem to authorise Judge Baldwin to
[*515] *suppose it was Mr. Kent's opinion, that chancery could
stop a public improvement, making under a law of the
state, until some future law should prescribe for compensation,
if it was doubtful whether such provision was made by any exist-
ing law.   The very point, however, came before him as Chan-
cellor, in 7 Johnson, 330.   It was decided in that case, that for
a naked trespass, for which compensation could be made in
money, the party must resort to his action of trespass.   An
injunction will not be granted unless under special circumstances;
or where the injury was irreparable; or there was an intention

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

not only to injure, but actually to destroy the subject in dispute; and some of the cases cited speak of property being of peculiar value for special purpose. All these are cases between private persons. The state has the unquestionable right to take property for public use; that is, to destroy all the right of the individual to that property—to pull down, or dig up, or haul away any property. As to the injury being irreparable, is there any such case? Is there any house or land which is necessary for public use, for which it is impossible to make a full and adequate compensation? But that question does not arise in the case before us; for there is no unimproved lot of ground separate from any other property of its owner which is not susceptible of valuation and compensation.

That case was an application for an injunction to prevent the commissioners from taking stone from the plaintiff's land, at a place sixty rods distant from any part of the canal. The stone alone were wanted; the ground whence it was taken, was not excavated, and not intended to be permanently occupied; and it was contended, that it was not a case in which compensation was provided for by any act. The chancellor considered it within the spirit, if not within the letter of the statute; and he says, " we must take expressions in the most extensive sense, when it is probable the lawgiver had in view everything pointed out by that ·extensive sense, and when we give to the expressions . the sense most suitable to the subject, and best adapted to the facility and success of a great and generous scheme of public policy."

The chancellor reviews all the cases in England and New York, in which injunctions had been granted against canal companies, or other companies acting under a law, and shows, that in every case it was where they had exceeded their authority, or acted directly contrary to it; and no case where they had acted according to its spirit and letter. He then considers the case as one in which the legislature had omitted to make provision for damages, and says, (page 344,) the omission, if it is one, does not prevent the right of the commissioners to enter and use the land, nor prevent the just claim of the owner from the commissioners, or the legislature, for his reasonable compensation. The commisioners are not trespassers when the act authorises them to enter, if they enter before *the damages are paid: (this was so decided in 20 Johns. 737). The claim for com- [*516] pensation arises after the use has been had, and the damages cannot well be assessed before they have arisen. Whatever, therefore, may be the better construction of the mode of ascertaining and enforcing the compensation, *it does not affect the right of the commissioners to enter, nor justify the interference of*

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

*a Court of Equity to interdict their entry."* And in the next page he concludes by saying; "but the question of compensation is distinct from the right of entry to take and use the land necessary for the purpose of the improvements; and that right I hold to be unquestionable, provided it be not abused in the exercise, through want of good faith or due discretion:" and on both grounds the injunction was dissolved.

The act of 2d April, 1831, section 11, authorises this company to enter for the purpose of exploring, locating, &c.; and after the route shall be determined, it authorises as follows: "it shall be lawful for the said company, their engineers, agents, officers, contractors, and servants, at any time to enter upon, take possession of, and use said land, subject however to such compensation as the said company may have agreed to pay therefor, or as shall be ascertained in manner hereinafter respectively directed."

Section 12, provides, that where the company cannot agree, or where from infancy or other incapacity, or from the absence of the owner, no agreement can be made, the Court of Common Pleas of the proper county, shall, on the application of either party, nominate and appoint twelve discreet and disinterested persons, &c. &c., and provides for notice by the sheriff to the parties and appraisers, and that each of the twelve shall be sworn that he will faithfully, justly and impartially value the land occupied or required for such rail-road, or other works, and all damages which the owner or owners shall sustain, or may have sustained, by reason of the construction of said rail-road and other works, taking into consideration the advantages as well as disadvantages of the same, to the said owner or owners, according to the best of his skill and judgment. The report is to be returned to the next Court; exceptions may be filed by either party within twenty days; the Court may affirm the same or set it aside, or issue a new precept; and when a report shall be confirmed, it shall have the effect of a judgment.

Under this act the road has been made to the suburbs of Philadelphia. Some difficulty having arisen after crossing the Schuylkill, the legislature, on the 27th of February, 1838, enacted, &c.

It is not certain when Prime street, west of Eleventh street, was laid out, or whether it was at all laid out in that part. I should suppose, as the rail-road company were to pay for the increased width of the road, that it had some width before; and then the meaning of the act will be, not that it shall be laid out, but laid out of the same breadth as it is east of Broad street. Many of the streets in the *vicinity of this city [*517] are laid out, and not opened the whole length, until or-

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

dered so to be by the Court on petition: and in more than one instance, the legislature have passed laws directing said streets, or parts of them, to be opened. The act in this case directs, that the commissioners shall forthwith open this Prime street—that is, open it of the breadth of one hundred feet. The rail-road company do not require so broad a space; thirty-three feet in the middle of the street is allotted to them; and they are authorised " to lay a double track of rails on the centre of this street, *immediately after the passage of this act.*"

The whole road from Baltimore to this city was completed to the Schuylkill; it was, I suppose, not contemplated, that the commissioners would neglect or refuse to open the street; but it was foreseen that the assessment of damages, appeals, and perhaps new assessments, might take some time, and is expressly enacted, as aforesaid, that the road may be completed without a day's delay after passing that act. If the road cannot be made on this street, it is stopped, for the act expressly directs, that the rails shall be laid on Prime street, and on no other street running parallel therewith. The road or street in question lies in Passyunk township, adjoining this city. By the seventh, eighth and ninth sections of the act of the 13th of June, 1836, the owner of any land through which a public road shall be opened, &c., may apply by petition to the Court of Quarter Sessions, who shall appoint six viewers, &c.; and this law makes full provision for ascertaining the damage, and the payment of it; but the company have no authority to petition the Court for viewers, nor the Court to appoint viewers on their petition. The applicant for this injunction can proceed to have his damages assessed. Instead of proceeding in that way, he applies to this Court for an injunction, until the damages are ascertained—which can never be ascertained, unless he petitions the Court of Quarter Sessions.

The act above cited is express and positive, that the commissioners may proceed to make this road, and lay their rails, without waiting for the action of the commissioners in opening the whole width of one hundred feet. It is to be done *immediately after the passage of this act*—not immediately after the street is opened.

The act is in some respects different from many others: it fixes with precision the site of the road, and prohibits any variation from it: it provides for compensation. But the petitioner alone can obtain the viewers: the company cannot proceed to have damages ascertained.

The object and intention of the law is as plain as its words. It was foreseen, that in the neighborhood of this city, every difficulty and obstruction which individual cupidity or perverse-

(Jarden *v*. The Philadelphia, Wilmington and Baltimore Rail Road Co.)

ness could suggest would be thrown in the way of the company; and it made *provision to arrest all this, and have this important road at once completed.

[*518]

If this man, instead of proceeding as is provided in all our road laws, rail-road laws and canal laws, can disregard the whole of their provisions, and ask an injunction—and if this Court will grant it, there is an end of internal improvements.

There can be no case imagined, where it may not be exercised as properly as in this case. The land is not improved: if the draft exhibited is correct, only somewhere between one quarter of an acre and an acre and a quarter will be occupied, and that near a corner of a ten acre lot.

As to the power of this Court. No Court ever declared an act of the legislature unconstitutional on motion, or on application for an injunction, if there was the smallest doubt. Judge Baldwin expressly states that his impression was, that the act of New Jersey was unconstitutional; but says he cannot declare it to be so in a question as to an injunction. And in the case before him, he only granted the injunction until the survey was filed, and the report of the commissioners was made, both of which were required by the act of assembly of New Jersey.

I shall conclude by a refrence to the last decision of this Court on the power of the legislature, and the subject of compensation. It had been decided before in 3d Yeates, 363, that a turnpike road was not private property, but a public highway; that laws forbidding a valuation of damages, until the work was done, and the appraisers could fairly estimate the injury, was constitutional: and Chancellor Kent thought it the most proper time. By an act of assembly of the 7th of April, 1832, it was provided, that on proper examination in the mode there prescribed, a street might be opened in the city of Pittsburg; and it was opened; some buildings, or parts of buildings, were pulled down, and the ground on which they stood converted into a street. By the law, this damage was to be rateably assessed on the owners of contiguous lots, who would derive benefit from the street being opened; and it was so assessed; but no method of enforcing the payment was found in the law. On the 6th of April, 1833, and while the Courts at Pittsburg were considering of objections to the reports of damages and assessments on those who were to pay, another act was passed, directing that the sums assessed on the contiguous lots should be a lien on the lots respectively, and recoverable by *sci. fa.* and judgment and execution. On a writ of error to one of those suits of *sci. fa.* it was objected, that the first act was unconstitutional, because it provided no mode of compelling compensation; and the second, be-

(Jarden *v.* The Philadelphia, Wilmington and Baltimore Rail Road Co.)

cause the advantage to the owners of the lots or parts of lots on which buildings had stood, was to be estimated. This Court decided both acts to be constitutional. See *M'Masters* v. *The Commonwealth,* (3 Watts, 292). This case recognises the same doctrine cited from the New York *cases; the right to take property for public improvements, of the propriety [*519] and utility of which improvements the legislature is to judge; that compensation must be made; but the legislature have the power of directing the mode of ascertaining the damages, and enforcing the payment of them; and that a law is not unconstitutional, because a particular individual thinks a better mode of proceeding might have been adopted.

I consider the case before us as nothing but a question on the constitutionality of this act of the 27th February, 1838, I cannot raise in my own mind a doubt of its own meaning. I cannot reject the words "are hereby authorised to lay a double track of rails on the centre of this street, *immediately after the passage of this act,*" and substitute the words *immediately after the street shall be opened.* The expressions are different, and I believe the intention was as different. The commissioners might refuse to open; be indicted; convicted; go out of office; and the same proceeding against their successors. At all events, the intention was the speedy completion of the road, and the certainty of compensation. The authority to enter is express and special. The road company can do no act to hasten the proceedings: the time of compensation depends on the complainant and the Court. The company offer to pay under either act. They must pay directly to the complainant, and not to the county. I cannot believe we have the power to resist an act of assembly which is not openly said to be unconstitutional, and which repeated decisions of this Court have sanctioned. I can see in this proceding what will stop every entry on land to make every canal or railroad. A man has nothing to do but refuse to ask compensation in the mode prescribed by law, and come to this Court to suspend its execution—nay, to send officers to resist its execution, whenever it can be made to appear to our satisfaction, not that it provides no compensation, but that a better or more speedy mode of compensation might have been devised. Canals and rail-roads have been begun, and not completed for months, nay, for years: the law makes no provision for compensation, nor even for assessment of damage, until it is completed; and we have decided that such cases are valid. The county officers are directed to open a street forthwith. I would consider this street as open, when its precise course and breadth is specially designated in the law. The commissioners of rail-roads are authorised to enter instantly; and we are asked to presume the county

officers will resist the law, and never open the road, and the owner will never be paid, or not paid for a month or two; and in defiance of the laws, and in contradiction to our own decisions, and those of the most distinguished jurists of other states, to arrest in a summary proceeding the execution of the law, and the completion of this improvement, and establish a precedent which may stop every improvement—to disregard plain expressions in a statute, and treat very lightly the authority of the [*520] legislature of our state: and I cannot *conceive any thing of worse example, or likely to produce worse effect, than one branch of our government disregarding, not to say contradicting and setting at naught, the acts and doings of another.   All former decision says we are not to resist or deny effect to a law, unless it is so clearly void, as to remove all doubt. This law is not said to be clearly void, or even void; yet we resist it, because it is not in every respect framed in a manner most agreeable to the complainant, and suspend it (as I understand the decision, at least,) until this Court meet in December, even though the county commissioners should open the street within a fortnight.   I say it is the legislature we resist: the rail-road company have acted as the law directed them to act. They have omitted no act required of them, or directed to be done by them: it is neither more nor less than an injunction to restrain them from acting as the law directs them to act; that is, it is a decision that the law is unconstitutional, or defective in some way which gives this Court power to suspend it.   Believing it to be neither unconstitutional, nor unjust, nor unwise, I cannot agree to the decision.

Motion refused.

Cited by Counsel, 10 Casey, 383; 1 Grant, 417; 2 Ashmead, 216.
Cited by the Court, 2 Harris, 196; 12 Id. 160: 1 Grant, 93; 5 P. F. Smith, 138.